LIBERTY ADVISORS LLC

**Tara Lenich**
Founder

July 16, 2026

The Honorable Mae A. D'Agostino
United States District Judge
United States District Court
Northern District of New York

*United States of America vs. Gregory Magin,* Case No. 1:26-cr-00052-MAD

Dear Judge D'Agostino:

This Mitigation Report is submitted at the request of defense counsel, Julie Nociolo, on behalf of her client, Gregory Magin. The goal of this report is to provide the relevant parties in this proceeding with a perspective that may not be reflected in the court papers.

**Sources of Information**

1. Client Interviews
   a. November 2025
   b. December 2025
   c. January 2026
   d. February 2026
   e. March 2026
   f. April 2026
   g. May 2026
   h. June 2026
   i. July 2026
2. Collateral Mitigation Interviews and Relationship to Defendant
   a. Rebekah Magin (wife)
   b. Beth Magin (mother)
   c. Michael Magin (father)
   d. Janine Carlin (sister)
   e. Jane Hanley (aunt)
   f. Ben Graham (uncle)
   g. Mary Regina Kiely (aunt)
   h. Rev. George P. Fleming (Pastor, Corpus Christi Church, Round Lake, NY)
   i. Amie Maguire (friend)
   j. Sarah Walsh (former work colleague)

LIBERTY ADVISORS
LLC

3. Conferences with Trial Counsel
    a. November 2025
    b. March 2026
    c. April 2026
    d. June 2026
    e. July 2026
4. Records Review
    a. Pleasantville High School Diploma
    b. State University of New York Plattsburg Diploma (Bachelor of Arts, History, 2001).
    c. Transformative Justice in Practice: Facilitating Individual Accountability (Completed April 19, 2025).
    d. Records and Letters from Taylar Delisle, LMCH-D, Clearwater Counseling Associates LCSW, PLLC Psychotherapy and Treatment (November 17, 2025, August 4, 2025, February 22, 2026).
    e. Risk of Sexual Abuse to Children (ROSAC) Report, Evaluator Amanda Peltier, M.A., LMHC (October 27, 2025).
    f. Psychosexual Assessment Summary, Katrina Colistra, PsyD, Licensed Psychologist, New Paradigm Psychological Services, PLLC (November 7, 2025).
    g. Charlie Health Treatment Plan, Andrea Ferrante, LCSW, Primary Therapist (January 26, 2026).
    h. Post-Arrest Certificates and Programs[1]
        i. April 19, 2025. *The Brain, Body and Trauma*. Course Completed. Conducted by Respect Together Campus, a joint effort between the Pennsylvania Coalition to Advance Respect (PCAR) and the National Sexual Violence Resource Center (NSVRC).
        ii. Jim W. Hooper, Ph.D. April 20, 2025. *Neurobiology of Trauma: From "Fight, Flight, Freeze" to "Reflexes and Habits."* Course Completed. Conducted by Respect Together Campus, a joint effort between the Pennsylvania Coalition to Advance Respect (PCAR) and the National Sexual Violence Resource Center (NSVRC).
        iii. Vic Strecher. April 27, 2025. *Finding Purpose and Meaning in Life: Living for What Matters Most*. Course Certificate. Conducted by the University of Michigan.
        iv. Louis R. Franzini, PhD. May 3, 2025. *Pedophilic Disorder*. Certificate of Completion. Conducted by Professional Development Resources.
        v. Professor Michael Kuhar. May 3, 2025. *The Addicted Brain*. Course certificate. Conducted by Emory University.

[1] This is not an exhaustive list but rather a sampling of the courses Greg completed while on pretrial detention.

vi. Tiesha Nelson, PsyD. May 7, 2025. *Treating People who Commit Sexually Deviant Behaviors*. Continuing Education Virtual Workshop. Conducted by A Healing Paradigm, LLC.
vii. Sonia Kumar. May 11, 2025. *Positive Psychiatry and Mental Health*. Course certificate. Conducted by the University of Sydney.
viii. Sonia Kumar. May 11, 2025. *Positive Psychiatry and Mental Health*. Course Certificate. Conducted by the University of Syndey.
ix. Dr. N. Kyle Smith. May 11, 2025. *Anxiety and Related Disorders*. Course Certificate. Conducted by the American Psychological Association and PsycLearn.

i. Letters submitted on behalf of Mr. Magin.
   i. Beth & Michael Magin
   ii. Rebekah Magin
   iii. Janine Carlin
   iv. Mary Regina Kiely (aunt)
   v. Ben Graham (uncle)
   vi. Pamela Lipkin (mother-in-law)
   vii. Sharon Breen (former neighbor)
   viii. Andrea Smith (neighbor)
   ix. Rev. George P. Fleming (Pastor)
   x. Nathalie Korpics (former colleague)
   xi. Beverly Shields (former colleague)
   xii. Sheila Giardina (former colleague)
   xiii. Sarah Walsh (former colleague)
   xiv. Brenda Brownell (former colleague)
   xv. Lyle Everett (former colleague, business associate)
   xvi. Marsha Anderson (former colleague)
   xvii. Amie Maguire (friend)
   xviii. Kristin Lyman Dinzey (friend)
   xix. Heather Faga (cheer mom)
   xx. Jeannette Pancoast (former colleague)

j. PACER docket entries for the above-mentioned matter (limited due to protective order)

k. Draft Presentence Investigation Report (PSR) prepared by U.S. Probation (June 1, 2026)

l. Programs Completed Since Incarceration at Schenectady County Jail
   i. 12-Step Recovery Programs
   ii. A Student Guide to Drug and Alcohol Abuse
   iii. Adapting to Change
   iv. Christian Leadership
   v. Cognitive Awareness
   vi. Offender Corrections

vii. Substance Abuse
viii. Parenting While Incarcerated
ix. Living out Your Identity in Christ in a Sexualized Culture
x. Changing Habits Around Drug and Alcohol Use
xi. Neuroscience in Action: An Introduction to Brian Development, Trauma and Addiction
xii. Impact: Families and Addiction

**Case Background[2]**

The information contained in this report is based upon extensive interviews with Greg Magin, in person, via zoom and on the telephone. In addition, I conducted in person interviews with his wife, Rebekah Magin, and his parents, Beth and Michael Magin, as well as telephone interviews with extended family members, lifelong friends, colleagues, and other individuals familiar with his personal history, character, mental health struggles, and rehabilitative efforts. Relevant records pertaining to Greg's case background, treatment, and personal development were also reviewed where available.

The mental health information summarized herein is derived from records and opinions provided by treating and evaluating professionals. The undersigned does not offer independent psychological diagnoses or clinical opinions but instead references these materials to provide context regarding Greg's developmental history and emotional functioning.

Nothing contained in this report is intended to diminish the seriousness of Greg's offense conduct or the profound harm associated with child sexual exploitation material. Greg accepts full responsibility for his actions and understands that he faces a substantial term of incarceration. Rather, the purpose of this report is to provide the Court with a fuller understanding of the person who stands before it today and the life experiences, relationships, and personal characteristics that shaped him long before the conduct underlying this case.

Several aspects of Greg Magin's social history offer mitigation factors for consideration in determining a disposition.

First, Greg has accepted responsibility for his conduct, expressed genuine remorse, and engaged in sustained self-examination following his arrest.

Second, he has no prior criminal history and, before this offense, lived an otherwise law-abiding life characterized by stable employment, meaningful family relationships, and positive contributions to his community.

[2] Unless specifically noted, social history information was obtained during interviews of Greg Magin.

Third, the accompanying expert evaluations conclude that Greg was living with previously undiagnosed Bipolar II Disorder and other mental conditions. Those reports provide clinical context regarding his emotional functioning and subsequent treatment.

Fourth, since his arrest, Greg has consistently engaged in individual treatment, family counseling, offense-specific therapy, educational programming, and other rehabilitative efforts.

Fifth, Greg has tremendous support from family members, lifelong friends, former colleagues, and community members. They acknowledge the seriousness of his conduct and remain committed to supporting his continued treatment, personal growth, and rehabilitation.

The following life history provides the context for these factors and a fuller understanding of Greg as a person beyond the present offense.

## Life History Overview

*Introduction*

Throughout his life, Greg Magin consistently measured his own value by the care, support, and stability he could provide to others. Whether as a son, husband, father, colleague, or friend, those who have known him throughout every stage of his life describe someone others naturally relied upon—someone who instinctively assumed responsibility, sought little recognition for himself, and found his greatest sense of purpose in caring for the people around him. At the same time, Greg struggled to recognize and communicate his own emotional needs. Rather than seeking help during periods of personal distress, he often internalized difficult emotions, remained constantly occupied, and attempted to manage problems on his own.

The life history that follows reflects these longstanding patterns. It traces Greg's development from childhood through adulthood, providing context for the values, relationships, and experiences that shaped his life while also documenting emotional struggles that remained largely unseen for many years. The report also documents Greg's sustained engagement in treatment, his acceptance of responsibility for the tremendous harm his conduct caused the victims, and the insight gained through extensive self-reflection following his arrest. It further chronicles the extensive work Greg has undertaken to better understand the factors that contributed to his conduct and to reduce the risk of future offending.

As discussed more fully throughout this report and in the accompanying expert evaluations, Greg was diagnosed following his arrest with Bipolar II Disorder[3], Major Depressive Disorder, Generalized Anxiety Disorder and Post-Traumatic Stress Disorder, conditions that had gone unrecognized and untreated for many years. These diagnoses are

[3] Taylar Delisle, LCSW, Clearwater Counseling Associates, February 26, 2026.

presented not to excuse or diminish his criminal conduct, but to provide the Court with a more complete understanding of his history and the therapeutic, educational, and rehabilitative efforts he has undertaken since entering the criminal justice system.

Those closest to Greg consistently described a man who quietly cared for those around him, valued relationships above recognition, and found his greatest sense of purpose in caring for others. Whether as a son, husband, father, family member, friend, colleague, or neighbor, he found fulfillment in being present for those he loved through both ordinary moments and life's greatest challenges.

Over the past year and a half, Greg has remained actively engaged in a process of treatment, education, and honest self-reflection. Through those efforts, he has developed a greater understanding of the previously untreated mental health conditions and unresolved childhood experiences that contributed to his offending behavior. He has devoted himself to maintaining and strengthening the family relationships that have long been central to his life while helping his loved ones prepare for the years ahead.

Based upon my interviews and the documents I have reviewed it is my opinion that Greg Magin has a strong foundation for leading a law-abiding and productive life after his incarceration. At 46 years old, his demonstrated commitment to treatment, accountability, personal growth, and rehabilitation supports that opinion.

*Childhood*

Greg was born on April 16, 1980, in Troy, New York, to Michael and Beth Magin and was raised in a close-knit family that emphasized education, hard work, faith, and personal responsibility. Greg's father worked for New York State's Department of Health and his mother worked as a registered pharmacist.

Greg and his younger sister Janine were very close as children. Janine recalls her older brother as sensitive, gentle and nerdy, always "looking out for [me], protecting [me]." She recalls performing skits for their parents and watching movies together and hanging out with the neighborhood kids playing games. His lifelong friend Amie Maguire says, "Greg is like a brother to me, we have been friends since we were five years old, our families went on vacations together and spent holidays together."

LIBERTY ADVISORS LLC



*Greg and his sister Janine Carlin*

Ms. Maguire recalled attending annual New Year's Eve gatherings hosted by the Magin family when Greg was approximately eight years old. While many children naturally gravitated toward playing games, she remembered Greg gathering books, blankets, pillows, and snacks for the younger children, creating a comfortable space where they could spend the evening together. Looking back, Ms. Maguire described that memory as an early example of the qualities that continued to define Greg throughout his life—his natural inclination to care for others and his tendency to assume responsibility without being asked.

That childhood memory was not an isolated observation. Greg's Aunt Jane recalls "Greg would go to his sister's dance recitals when she was two or three and cheer her on – how many six-year-old boys would do that?" Whether recalling ordinary evenings at home or family holidays and gatherings, they consistently remembered Greg as someone who cared for others.

Michael and Beth Magin encouraged their children to pursue their interests, work hard, and remain actively involved in school and their community. His mother recalls, "Greg developed a love of music at a young age and spent countless hours to learning and practicing the saxophone."

While Greg's childhood was marked by many positive experiences, he also had experiences that affected his emotional development in ways that remained largely unrecognized for many years. Greg experienced sexual abuse during childhood and adolescence that he did not disclose until adulthood. Specifically, at a family gathering when Greg was approximately five years old, an older male cousin pulled Greg's pants down, touched his genitals, and told him they were "playing zoo and that [he] needed to stay quiet." This was not an isolated incident. For approximately two years, his cousin continued this pattern of abuse. Those experiences remained hidden for decades and became part of a broader pattern of internalizing emotional distress rather than sharing it with those closest to him.

Greg, his sister Janine and his friend Ms. Maguire described a family environment in which personal struggles were generally managed privately, and difficulties were seldom discussed openly. As a result, Greg learned early to manage disappointment, stress, and emotional pain internally. Rather than asking for help, he routinely responded by remaining busy, focusing on school, music, athletics, friendships, and other activities.

Despite these unseen struggles, Greg's aunt and uncle remember a child who was respectful, dependable and eager to help others. The qualities described by his parents, Aunt Mary, Uncle Ben, and Ms. Maguire would continue to emerge throughout adolescence and adulthood.

*Adolescence & High School*

As Greg entered adolescence, the qualities that had characterized his childhood became more pronounced. Family members, teachers, coaches, and lifelong friends consistently described him as dependable, hardworking, respectful, and deeply committed to the responsibilities he assumed. He maintained an exceptionally full schedule, balancing academics, athletics, music, employment, and community involvement while continuing to place high expectations on himself. Beth Magin recalled simply, "Greg always kept busy."

Throughout middle school and high school, Greg continued to excel academically while remaining actively involved in numerous extracurricular activities. After attending public junior high school, his parents gave him the choice of attending public school, military school, or parochial school. Greg chose Catholic Central High School, becoming the third generation of the Magin family to attend, following his father, grandparents, aunts, and uncles. Michael Magin recalled how meaningful that decision was to their family and remembered feeling proud that Greg chose to attend his alma mater and continue a family tradition that had spanned generations.

Greg described himself as "a history nerd" and enrolled in several Advanced Placement courses. He played junior varsity and varsity soccer, competed on the varsity track and cross-country teams, learned to play the saxophone because "Clarence Clemons from the E Street Band was Dad's favorite," and participated in school plays. Although the Magin family attended church periodically, faith held personal significance for Greg, and he was confirmed in the Catholic Church during high school. His teachers and administrators recognized his leadership qualities by selecting him to attend a youth leadership conference in Washington, D.C. Michael and Beth Magin recalled that Greg approached each commitment with quiet determination and rarely needed to be reminded to follow through on what he had promised.

In addition to his academic and extracurricular responsibilities, Greg began working during high school. He worked at Record Town and Strawberries, became a certified umpire for Little League, Babe Ruth, and Sandy Koufax baseball leagues, and later served as a FIFA soccer

referee. Beth Magin recalled that Greg took pride in earning his own money and often used his paychecks to buy Christmas presents for family members rather than spending them on himself.

Gerg's lifelong friend, Amie Maguire, recalled that even as teenagers, Greg often assumed the role of organizer and caretaker within their group of friends. While others focused primarily on themselves, she remembered Greg paying attention to whether everyone else was "included, comfortable, and having fun." Looking back, she believes those qualities reflected the same character she observed during childhood and continued to witness throughout adulthood.

When Greg was approximately 15 years old, he was again pressured into sexual acts by an older friend. He recalls several specific events when the "friend" would not let Greg out of the car after practice until Greg met his sexual needs. Greg describes these incidents as "mostly hand jobs, some oral, never intercourse." When asked if he ever told anyone about this abuse, he said "Rebekah knows all of it, my parents, as far as I know, know none of it." As was Greg's pattern, rather than talking to his parents about what happened, he devoted his energy to school, athletics, music, work, and service to others. Greg outwardly appeared successful and well-adjusted, while silently dealing with the emotional impact of his experiences.

By the time Greg graduated from high school, he had established a reputation as a responsible young man who worked hard, cared deeply about his family and friends, and consistently followed through on the commitments he made.

*College Years and Early Adulthood*

Greg attended the State University of New York at Plattsburgh, where he earned a bachelor's degree in history. During his freshman year, he met Rebekah, a junior transfer student who lived on the same floor of his residence hall.

Rebekah recalled that, from the very beginning, Greg possessed a quiet steadiness that drew people to him. "We started as friends, then best friends, and then started dating—all within a month of meeting. We actually bonded over a Christian rock band, Jars of Clay." Greg similarly reflected on those early years, explaining, "As soon as I met her, I could not imagine my life without her. She is a beautiful human."


*Janine, Rebekah and Greg*

While at SUNY Plattsburgh, Greg remained actively involved in campus life. He wrote for the student newspaper, *Cardinal Points*, and was elected to student government during each of his four years at the university. During his junior year, he served as a vice president and participated on a joint faculty-student committee responsible for establishing the university's Diversity, Equity, and Inclusion Office. Consistent with his longstanding interest in history, Greg also studied abroad during his sophomore year in the Yucatán Peninsula, studying Mayan history and archaeology, and later traveled to Morocco and Tunisia to study history and cultural anthropology. During his college summers, he worked for a local archaeologist excavating historical sites and later with the New York State Capitol Architect's Office, assisting with restoration efforts to uncover skylights that had been painted over during World War II.

Although Rebekah graduated one semester later to complete her student teaching practicum and Greg graduated one semester early, the couple continued building their relationship. In August 2001, Rebekah accepted her first position as Assistant Director of a learning center in Framingham, Massachusetts. Greg remained in Plattsburgh until completing his degree before joining her several months later when they rented an apartment in Boston.

After relocating to Massachusetts, Greg worked as a paralegal while attending Suffolk Law School. When asked why he chose law school, he reflected, "I was always supposed to be a lawyer, and I thought I liked the idea of it." The experience proved far more difficult than he anticipated. He struggled academically, was placed on academic probation after his first year, and ultimately decided not to return. Looking back, he described that period simply: "I felt like a failure. I had never failed at anything before. It didn't feel good, and I didn't know what I was going to do because this was what I was supposed to be."

Rebekah recalled that this was one of the few periods during which she observed Greg lose confidence in himself. She described him as "depressed—not clinically, and for a relatively short time." She also explained that Greg had always moved "from serious job to serious job." Whether working in archaeology, officiating youth sports, practicing as a paralegal, or later recruiting, Greg consistently gravitated toward positions that carried responsibility and allowed him to work closely with others. Rebekah explained that he genuinely enjoyed meeting people, building relationships, and helping others recognize their strengths and succeed. During this period, one of the law firms where Greg worked downsized, resulting in the loss of his position. He continued working as a paralegal and, after returning to New York, also accepted a position as a recruiter—a role that would later lead to the next stage of his professional career.

In 2003, Greg proposed, and the couple became engaged.

*Marriage and Early Family Life*

Before returning to New York, Greg and Rebekah spent a month traveling across the country together, carefully planning the trip with savings, coupons, and AAA TripTiks. Both

LIBERTY ADVISORS
LLC

recalled that the experience strengthened their relationship and reinforced the way they approached life's challenges—as partners who made decisions together and worked through obstacles as a team.

After returning to the Capital Region, Rebekah enrolled in the Master of Social Work program at the State University of New York at Albany. The couple settled in Cohoes, New York, where Greg continued working as both a paralegal and recruiter while Rebekah attended graduate school full time.

Shortly after returning home, their plans changed unexpectedly when Rebekah's sister became unable to care for her infant daughter. While Greg worked two jobs to support the household, the couple assumed a significant role in caring for their young niece, who spent nearly every weekend with them during her first year of life. Rebekah smiled as she recalled, "Greg did it all." She remembered him feeding her, changing diapers, rolling around on the floor playing with her, and embracing responsibilities they had never anticipated. "This wasn't what we had planned for our first year back home," she said, "but that's what we did."

In adulthood, faith became a more meaningful and active part of Greg's personal life. Greg and Rebekah were married in October 2005 in a nondenominational church, with their reception held at the National Museum of Dance in Saratoga Springs. Their niece served as the flower girl, and their sisters stood beside them as bridesmaids. Reflecting on the foundation of their marriage, Rebekah explained, "We discussed everything, every decision, every issue that came up. We have always talked it out."

Michael and Beth Magin recalled that Rebekah became part of the family almost immediately, and that Greg consistently encouraged Rebekah's personal and professional goals, supporting her throughout graduate school while working to provide stability for their growing family.

Following their marriage, Greg and Rebekah continued establishing both their careers and their home. After earning her Master of Social Work (M.S.W.) in 2007, Rebekah joined St. Catherine's Center for Children as a social worker, where she would spend the next seven years supervising foster and residential group homes. Greg continued working as both a paralegal and recruiter before ultimately transitioning into recruiting full time. Reflecting on that decision, he explained, "It seemed more like me—talking to people, getting them a job. I liked it, and I excelled at it."

In 2008, the couple purchased their first home, and later that year welcomed their first daughter, [redacted] Greg recalled seeing her for the first time with unmistakable emotion. "I was in awe. She is the light of my life."

LIBERTY ADVISORS LLC

Rebekah remembered that becoming parents only strengthened the partnership they had built over the previous decade. "We were delighted, and we were a team. Greg and I have been a team since we were in college, and we always will be. There was no division of labor. One of us simply picked up where the other left off." She laughed as she recalled that Greg handled "half or more of the midnight feedings" because he loved sitting with [redacted] feeding her, and telling her stories.

In 2010, Greg accepted a position with Garnet River after being recruited by one of his clients. The position proved to be an excellent fit, allowing him to combine his ability to build relationships with his desire to help others succeed. Greg recalled that he quickly found both a mentor and a close friend within the company, someone who broadened his perspective, introduced him to opportunities beyond the Capital Region, and encouraged his professional growth. Looking back on those years, Greg reflected simply, "From 2008 to 2014, we were just cruising along. I was happy."

Later that year, in November 2010, Greg and Rebekah welcomed their second daughter, [redacted] completing the family they had spent the previous decade building together.

*Family Life: Raising Daughters*

During my first interview with Greg, our conversation quickly turned to his daughters. Rather than beginning with his own circumstances, Greg asked whether I had read *The Five Love Languages of Children*. When I told him I had not, he carefully explained the concept before describing the different ways each of his daughters experienced love and encouragement. He explained that [redacted] most appreciated physical affection, while [redacted] would much rather receive a gift card to buy her favorite Starbucks drink. As he described each of his daughters, it became apparent that he had devoted considerable thought to understanding them as individuals and intentionally approached each relationship according to their unique personalities and needs.



*Greg, Rebekah,* [redacted] *&* [redacted]

Rebekah independently described the same approach. "He wanted to be part of everything they were doing," she explained. If one of the girls developed a new interest, "Greg learned about it too." Whether attending school activities, sharing hobbies, helping with projects, or spending time together, she recalled that he found genuine joy in experiencing life alongside his family. "There wasn't a division of labor," she explained. "One of us simply picked up where the other left off."

As [redacted] developed a love for theater and musical performance, Greg became one of her greatest supporters. Beth recalled, "Greg and [redacted] would come over and put on shows for Mike and me. He would dress up as whatever character [redacted] assigned him and perform the entire show." Rebekah similarly recalled that her husband attended performances, rehearsed songs and skits with [redacted] helped her practice lines, and enthusiastically encouraged her creativity. Uncle Ben observed that Greg consistently invested himself in [redacted]'s interests because they mattered to her, not because they reflected his own.



*Rebekah, Greg, [redacted] and [redacted] on vacation.*

Uncle Ben recalled that one quality always stood out to him: although [redacted] and [redacted] had very different interests, Greg consistently found ways to make each daughter feel equally important. While [redacted]'s weekends often revolved around rehearsals and performances, Greg was equally committed to traveling with [redacted] for cheer competitions, ensuring each daughter received the same time, attention, and encouragement.

Aunt Mary recalled another example that remained vivid in her mind. During the final years of Greg's grandmother's life, while she resided in a nursing facility, Greg and Rebekah regularly brought [redacted] and [redacted] to visit. The girls often made handmade cards or picked flowers before each visit. Mary remembered watching Greg encourage those traditions, explaining, "That was Greg. He made seeing their great-grandmother a priority and taught the girls to bring something they had made. It was very special."

The years that followed also brought significant challenges for the family. It was during this time that Greg leaned into his religious faith. Greg remarks that "faith provided me with a

sense of structure, stability, and personal grounding." Rebekah also began attending church with her husband more regularly and she says, "we brought [redacted] and [redacted] occasionally, it is their choice to pursue spirituality and religion." Although his family attended church periodically during his childhood, Greg described religion within his parents' home as more routine and culturally expected than emotionally reflective or deeply discussed. More personal conversations regarding faith, emotional struggles, or vulnerability were uncommon.

In 2011, Greg's maternal grandfather passed away after living with Greg's parents for many years. Greg described him simply as "the one who got it." An entrepreneur throughout much of his life, his grandfather quietly encouraged Greg and Rebekah during their early years together, occasionally lending them money without telling Greg's parents and offering support as they established themselves. Greg described his grandfather's death as a profound personal loss.

In 2014, the family experienced another unexpected loss when Rebekah's father passed away. After maintaining seventeen years of sobriety, he had become a substance abuse counselor and remained deeply involved in Greg and Rebekah's lives. He frequently cared for [redacted] and [redacted] and had planned to babysit the girls the day after his death. Rebekah recalled the shock of receiving the call that he had unexpectedly passed away, a loss that deeply affected the entire family while the girls were still very young.

Despite these losses, family life continued to revolve around [redacted] and [redacted] Those interviewed consistently recalled that Greg organized much of his time around his wife and daughters—not through grand gestures, but through the ordinary routines of daily life. Whether attending performances, traveling to competitions, reading bedtime stories, helping with homework, celebrating milestones, or simply being present, the memories shared by family members reflected a father who expressed his love most consistently through his time, attention, and presence.

In January 2020, the Netflix docuseries *Cheer* was released. The Magin family watched the series together, and [redacted] was immediately "hooked." She told her parents she wanted to try competitive cheerleading. Rebekah recalled, "I never thought I would be a cheer mom, but we both just wanted to support our girls and whatever interests they had."

In the summer of 2020, the family faced another significant challenge when [redacted] suddenly became ill. Mr. and Mrs. Magin noticed that [redacted] was very tired and weak her thighs hurt to the point that she could not ride her bike. Initially, physicians were unable to reach a diagnosis despite months of testing and evaluation. As her condition worsened, she underwent extensive testing by multiple physicians and specialists before she was ultimately diagnosed in the fall of 2020 with juvenile dermatomyositis, a rare and serious autoimmune disease.

Mr. and Mrs. Magin both described this period as one of the most difficult their family had experienced. Mrs. Magin explained that [redacted]'s illness was so severe that "her body was

eating itself from the inside out," requiring repeated hospitalizations and assistance with many basic daily activities. Greg frequently remained overnight with [redacted] during her hospital stays while physicians worked to stabilize her condition. Mrs. Magin recalled that the seriousness of [redacted]'s diagnosis became especially real when the Make-A-Wish Foundation contacted their family, saying, "I broke down and cried because it shook my foundation that our happy, healthy girl was facing something so serious."

Also, during this time, Greg and Rebekah sold their home so they moved in with Greg's parents for six months until they purchased a new home in February 2021. Living with Greg's parents was "challenging as our daughters wanted privacy and peace, especially with [redacted] so sick and Greg's parents had a hard time with that. They wanted to be around all the time. It was just hard" says Rebekah.

Throughout [redacted]'s treatment, Greg remained actively involved in her care. Rebekah recalled that he attended medical appointments, stayed with [redacted] during hospitalizations, frequently remained overnight at the hospital so she would not face those experiences alone, and continued to provide steady support throughout her treatment. Family members described this period as frightening and emotionally exhausting yet consistently recalled that Greg remained focused on helping [redacted] and supporting his family.

Thankfully, [redacted] ultimately responded to treatment and was able to progress to inpatient treatment every 1-12 weeks. During this time, Rebekah also noticed that Greg "switched into a mode of 'I have to do everything" but "as [redacted] got better, Greg did not." She recalls that he worked more and tried to do everything better – be there for [redacted]'s cheer competitions, take [redacted] to play rehearsals, help her form a new business.

[redacted]'s condition has deteriorated over the last year, and she is currently receiving monthly inpatient treatments. Greg has been permitted to accompany her to the hospital on several occasions with his mother present.

[redacted] graduated in June from Burnt Hills-Ballston Lake High School, where [redacted] will be a junior this fall. [redacted] is taking a gap year to pursue musical theater, participate in local productions, and apply to colleges. This summer, [redacted] is attending a ballet program, another activity she has long enjoyed.

*Professional Life*

Greg's professional career evolved in much the same way as the rest of his adult life—through relationships, opportunities, and a willingness to assume increasing responsibility. After deciding not to return to law school, he worked as both a paralegal and recruiter before transitioning into recruiting full time. Reflecting on that decision, Greg explained, "It seemed more like me—talking to people, getting them a job. I liked it, and I excelled at it."

In 2010, Greg joined Garnet River after being recruited by one of the company's clients. He described the position as a turning point in his professional development, explaining that he found not only meaningful work but also an important mentor who became a close friend. Greg recalled that his mentor broadened his perspective, exposed him to opportunities beyond the Capital Region, and encouraged him to continue growing professionally.

In 2016, following his mentor's encouragement, Greg accepted a position as a Healthcare Sales Executive with CipherHealth. Two years later, he joined HighPoint Solutions in a similar role before being recruited to HealthStream in 2019.

At HealthStream, Greg found an opportunity to combine his relationship-building skills with his growing expertise in healthcare technology. During the next six years, he received three promotions and increasing responsibility. By the time his employment ended following his arrest, Greg served as Director of Regional Accounts, supporting approximately 175 healthcare organizations nationwide.

Much of Greg's work at HealthStream occurred during the COVID-19 pandemic, when hospitals and healthcare systems were adapting daily to unprecedented operational challenges. Sarah Walsh first met Greg in 2020 while serving as Director of Training and Development for a healthcare system that utilized HealthStream's learning platform. The two worked closely together, often speaking weekly, as they sought to ensure frontline healthcare workers had timely access to critical educational resources, including courses for labor and delivery nurses and Basic Life Support (BLS) certification.

Sarah recalled that Greg consistently made himself available during an extraordinarily demanding period for healthcare providers. As priorities shifted rapidly and new challenges emerged almost daily, she described Greg as someone who “bent over backwards” to help. Rather than simply serving as her primary point of contact, he introduced Sarah to other members of his team whenever additional expertise was needed, ensuring she had access to the people best equipped to solve problems quickly.

What remained most meaningful to Sarah, however, extended well beyond their professional relationship. During the same period, Sarah's younger sister became critically ill, and Sarah assumed responsibility for advocating for her medical care. Greg frequently asked about her sister, Katie, and whether there was anything he could do to help. Sarah found those conversations particularly meaningful because, as she explained, “I couldn't do anything for him professionally.” In her view, Greg’s concern reflected a genuine interest in people rather than simply maintaining business relationships. “Relationships mattered to him,” she explained. “He cared about who I was as a person. You don't see that very often.”

When Sarah was laid off following the pandemic, Greg was one of the first people to contact her. Remembering both her abilities and her familiarity with HealthStream's learning

management system, he encouraged her to consider joining his team. Sarah viewed that gesture as entirely consistent with the person she had come to know—someone who remained invested in helping others long after the immediate business relationship had ended.

**Criminal History and Circumstances of the Offense**

Greg Magin does not have a criminal history. He has lived a law-abiding life, marked by devotion to his family and his professional responsibilities. His lack of any prior criminal conduct stands in stark contrast to the offenses underlying this case.

In July 2024, Greg possessed and distributed unlawful images and videos via an electronic device. In December 2024 a search warrant was conducted of his family home, and he was subsequently interviewed and his cellphone confiscated. During Greg's interview he admitted to the possession of unlawful material and stated that he needed continued therapy. On March 14, 2025, Greg was arrested pursuant to a federal criminal complaint.

From March 2025 until his guilty plea in March 2026 Greg lived with his parents. Since his guilty plea, Greg has remained in the custody of the Schenectady County Jail.

The factual circumstances underlying Greg's conviction are thoroughly set forth in the charging documents, plea agreement, Presentence Investigation Report, and the parties' sentencing submissions. Because this report is intended to supplement, rather than duplicate, those materials, the underlying facts are not repeated here. Instead, the following sections focus on Greg's response following his arrest, including his efforts to better understand the factors that contributed to his offending behavior and the work he has undertaken to reduce the risk of future misconduct.

**Post-Offense Conduct and Behavior**

*Initial Response*

Beginning with his interview by the FBI in December 2024, Greg accepted responsibility for his conduct. Within days of learning that he was under investigation, he sought professional counseling, a commitment he has maintained continuously since that time. Through treatment and self-reflection, he has worked to better understand the factors that contributed to his offending behavior and to ensure that such conduct is never repeated.

When asked to reflect upon his conduct, Greg stated:

"There is not a day that goes by that I do not regret my behavior, the tremendous harm I have caused to the victims, my wife, daughters, parents, sister, and my community as a whole. I feel deep shame and remorse."

As our conversations progressed, Greg spoke with increasing depth about the victims of his offenses. He expressed profound remorse for the lasting harm they have suffered. He understands that no explanation, apology, or sentence can undo what they have endured.

Greg recognizes that the consequences of his actions extend far beyond his own punishment. He has witnessed the profound impact his conduct has had upon his wife, daughters, parents, sister, extended family, and lifelong friends, and acknowledges that the harm caused by his actions cannot be undone.

In the days following his arrest, Greg made the difficult decision to personally contact many of the people who had been most significant throughout his life, including family members, lifelong friends, and former colleagues. Rather than allowing them to learn about his arrest through the media or from someone else, he believed they deserved to hear the truth directly from him. Although each conversation was unique, those interviewed consistently recalled that Greg accepted responsibility for his conduct, apologized for the pain he had caused, and acknowledged that they might no longer wish to have a relationship with him.

Amie Maguire recalled receiving a phone call from Greg shortly after his arrest. "He said, 'I wanted you to hear this from me,'" she remembered. Greg spoke with her about what had happened, apologized for the pain he had caused, and understood that she might never want to speak with him again. Amie recalled that Greg also spoke about the victims of his conduct and expressed genuine remorse for what they had endured. She remembered that throughout the conversation, Greg was deeply concerned about the pain and disappointment his actions had caused those closest to him. As Amie explained, "[h]e knows what he did was wrong. He has taken ownership of his mistakes and is working on himself while looking to the future."

Aunt Mary similarly recalled that Greg contacted her personally before she learned about the case elsewhere. She remembered him apologizing for the hurt and heartache he knew his actions would bring to the family and telling her that he understood if people no longer wanted him to be part of their lives.

Sarah Walsh recalled that Greg reached out to her shortly after his arrest because he wanted her to hear directly from him what had happened. She remembered that he spoke about the children harmed by what he had done and the pain he knew it had caused, while also recognizing that she might need time to process what he was telling her. Rather than asking for forgiveness, Greg gave Sarah the space to respond in her own time. Her response was simple: "I am not going to judge you on your worst day." She has remained a source of support throughout these proceedings.

*Treatment, Faith and Self Reflection*

During the latter part of 2024, both Greg and Rebekah recognized that he was struggling emotionally. Over the preceding months, Rebekah had observed increasing depression, withdrawal, and isolation, and the couple began discussing counseling. During this time, Greg contacted the National Suicide & Crisis Lifeline, purchased several books addressing mental health and personal growth, and sought both professional and spiritual guidance.

As his emotional distress continued, Greg increasingly turned to alcohol as a coping mechanism. He later disclosed to Rebekah that he had concealed the extent of his drinking, at times purchasing two bottles of alcohol while leaving one in plain view and hiding the other. As with many of the emotional struggles described throughout this report, he attempted to manage his distress privately rather than asking for help.

In December 2024, Greg sought individualized pastoral guidance from Reverend George Fleming at Corpus Christi Roman Catholic Church. Father Fleming, who had known Greg for several years through his participation at Corpus Christi and the sacrament of reconciliation, began meeting with Greg weekly and frequently continued those conversations following Sunday Mass.

Following his interview with the FBI in December 2024, Greg was referred for a mental health assessment. He went to a mental health clinic that evening. The following week, he met with a psychiatric provider through Willow Behavioral Health via telehealth, was prescribed sertraline, and was referred to Clearwater Counseling Services, where he began individual psychotherapy with Taylar Delisle, LMHC-D., in January 2025.

From January 2025 through February 2026, Greg participated in individual psychotherapy with Taylar Delisle, LMHC-D., attending one in-person and one telehealth session each week. During treatment, he was diagnosed with Bipolar II Disorder. Ms. Delisle's February 2026 Patient Termination Notice reflects diagnoses of Bipolar II Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, and Post-Traumatic Stress Disorder.

In January 2025, Greg voluntarily enrolled in weekly sex offender group therapy through New Paradigm Psychological Services, several months before it later became a condition of his pretrial release. Greg also underwent a Risk of Sexual Abuse of Children (ROSAC) assessment, which concluded that he presented "no clear present risk." In November 2025, Dr. Katrina Kolistra completed a comprehensive psychosexual evaluation, concluding that Greg's overall sexual re-offense risk was "Below Average."

During this same period, Greg participated in weekly couples counseling with his wife, Rebekah, family therapy with Rebekah and their daughters, continued meeting weekly with

Reverend Fleming, and, beginning in September 2025, bi-weekly spiritual direction with Deacon Charlie Hall of the Roman Catholic Diocese of Albany.

In January 2026, Greg's treating therapist, Taylar Delisle, LMHC-D., referred him to Charlie Health after determining that he would benefit from a higher level of care. Charlie Health provided a virtual intensive outpatient (IOP) level of care consisting of group and individual therapy while supplementing Greg's ongoing individual psychotherapy and psychiatric care. Greg immediately followed Ms. Delisle's recommendation and remained actively engaged throughout the program.

In addition to his formal treatment, Greg devoted substantial time to independent study, completing approximately thirty educational courses and certificate programs addressing mental health, healthy relationships, communication, relapse prevention, emotional regulation, and personal growth.

Those closest to Greg observed the meaningful changes in the way he communicated, reflected, and interacted with others during the year between his arrest and guilty plea.

Having participated in weekly couples counseling throughout much of the past year, Rebekah described a relationship that has required difficult and often painful conversations. She explained that, while the consequences of Greg's conduct continue to affect every aspect of their lives, counseling has provided a structured setting in which they have worked through issues of accountability, communication, and the future of their family. Rebekah observed that Greg has become more emotionally present and engaged, reflecting the same openness and willingness to communicate that had characterized their relationship for many years.

*Conduct While Incarcerated*

Since entering federal custody at Schenectady County Jail following his guilty plea, Greg has continued the efforts he began following the commencement of this case. Although many of the treatment opportunities available to him while on pretrial release are no longer available in custody, he has remained engaged in the treatment, programming, and educational opportunities that are available.

While incarcerated, Greg continued participating in mental health treatment, initially meeting weekly with a therapist and continuing to participate in treatment as services have been available. His medication has also been adjusted, with the dosages of both prescribed medications increased to address his ongoing mental health needs. He has continued participating in the programming available to him, completing educational courses addressing topics including healthy relationships, recognizing the sexual components of offending behavior, alcohol dependency, and faith-based studies. Greg has continued practicing his faith while

incarcerated. Reverend Fleming has also visited him at Schenectady County Jail, continuing the pastoral relationship they established before his arrest.

Greg has likewise maintained close and consistent contact with his family throughout his incarceration. Rebekah remains in contact with him almost daily and has visited him twice. His parents and sister have likewise continued visiting him while he has been incarcerated. Their involvement has remained constant throughout these proceedings, continuing the same support they provided during his period of pretrial release.

**Character, Reflection and Evaluative Analysis**

Friends, family members, and colleagues consistently described Greg as dependable, compassionate, and deeply devoted to his family. His sister, Janine, referred to him as her "favorite person" and the one who "shows up for everyone." Lifelong friend Amie Maguire described him as "responsible and caring" and "a devoted husband and parent." Although each individual knew Greg in a different capacity and at different stages of his life, their observations remained remarkably consistent.

During our interviews, Greg presented as engaged, candid, and forthcoming, including when discussing difficult childhood experiences, his offending behavior, and the profound harm caused by his conduct. I observed an individual who did not attempt to minimize his actions or shift responsibility to others. Rather, he demonstrated a willingness to examine painful aspects of his life while accepting the consequences of his decisions. As our discussions progressed, he spoke with increasing openness about the tremendous harm his conduct caused the victims, conversations that reflected the depth of his remorse.

Greg spent much of his life becoming the person others needed him to be—a devoted husband, loving father, dependable son, accomplished student, trusted colleague, and quiet leader—while gradually losing the ability to recognize and communicate his own emotional struggles. Responsibility became central to his identity, achievement became his measure of self-worth, and remaining busy often became a substitute for confronting painful experiences or asking for help. This pattern emerged consistently throughout interviews with family members, lifelong friends, and those who knew him professionally.

Nothing in my evaluation diminishes the seriousness of Greg's conduct or the profound harm it caused to the victims. Greg has accepted responsibility for his conduct and understands that he will spend many years in federal custody as a result of his guilty plea. During the course of this case, he was diagnosed with previously untreated mental health conditions and engaged in extensive treatment, including individual psychotherapy, psychiatric care, sex offender group therapy, couples counseling, family therapy, spiritual counseling, and independent educational programming. Those diagnoses do not excuse or diminish his conduct. They do, however,

provide important context when considered alongside the psychological evaluations, treatment history, and sustained rehabilitative efforts documented throughout this report.

Equally significant has been the consistency of Greg's conduct from the beginning of this case through his incarceration. He sought treatment before his arrest, remained actively engaged in treatment while on pretrial release, and has continued participating in the programming, mental health care, educational opportunities, and spiritual practices available to him while incarcerated. Just as consistently, his family has remained actively involved throughout these proceedings through counseling, regular communication, and continued visitation. Father George Fleming observed Greg speaking with increasing openness about the gravity of his conduct and the tremendous harm it caused the victims while continuing to engage in difficult conversations about his conduct, his relationships, and his future.

Based upon the totality of the information reviewed, the records examined, and the individuals interviewed, I respectfully conclude that a sentence at the lowest end of the Rule 11(c)(1)(C) plea agreement appropriately recognizes both the seriousness of the offense and Greg's demonstrated commitment to treatment and rehabilitation.

Thank you for your time and consideration in this matter.

Respectfully submitted,

____________________________

Tara Lenich
Mitigation Specialist
Liberty Advisors LLC